# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

HARALD MCPIKE,

        Plaintiff,

    v.

ZERO-GRAVITY HOLDINGS, INC. f/k/a
SPACE ADVENTURES LTD., THOMAS
SHELLEY AND ERIC ANDERSON,

        Defendant.

Civil Action No.

1:17cv562-TSE/JFA

FILED

2017 MAY 17  P 3:17

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

## COMPLAINT

Plaintiff Harald McPike ("Mr. McPike" or "Plaintiff"), by his attorneys Clare Locke LLP and Seward & Kissel LLP, for his Complaint against Defendants Zero-Gravity Holdings, Inc. (formerly known as Space Adventures Ltd.) ("Space Adventures" or "SA"), Thomas Shelley ("Mr. Shelley") and Eric Anderson ("Mr. Anderson" and together with Space Adventures and Mr. Shelley, "Defendants") alleges, on personal knowledge as to his actions and upon information and belief as to the actions of others, as follows:

## INTRODUCTION

1.    This is an action for fraud, consumer fraud, breach of contract, conversion and unjust enrichment arising out of a planned circumlunar space flight for Plaintiff that was to have been provided by Space Adventures.

2.    Plaintiff is an investor and adventurer who has skied to the North and South Poles and scaled some of the world's highest peaks. A mission to the moon literally was to be his final frontier.

3.     Space Adventures was a provider of space travel to private individuals – essentially, acting as a travel agent or broker between its clients and Russian space agencies – and had seven clients who had made a total of eight flights to the International Space Station aboard Russian spacecraft.  At all material times, Mr. Shelley was the Chief Executive Officer of Space Adventures, and Mr. Anderson was its Chairman.

4.     In 2012, Space Adventures was marketing an opportunity for circumlunar travel aboard Russian spacecraft.  This opportunity was of great interest to Plaintiff, who contacted Defendants.

5.     Defendants represented orally and in writing that Space Adventures had "reserved and owned the rights to provide a circumlunar space flight" from the appropriate entities within the Russian Federation.  Defendants also represented that the space flight could reasonably be expected to take place within six to eight years.  Both of those pre-contractual representations were untrue.

6.     Relying on Defendants' precontractual representations, Plaintiff entered into a contract in March 2013 (the "Agreement" or "Agr.") with Space Adventures for a circumlunar space flight (the "Circumlunar Mission") aboard a Russian Federation spacecraft and utilizing a Russian Federation launch vehicle. The total cost under the contract was to be $150 million.  In March 2013, Plaintiff paid a first installment of $7 million for the flight.

7.     The Agreement included, as a representation and warranty, that Space Adventures possessed the necessary rights to provide a circumlunar mission to Plaintiff.  The Agreement also included strict confidentiality, non-competition and non-circumvention provisions that effectively forbade Plaintiff from contacting Russian Federation space agencies directly and without Space Adventure's involvement.  These provisions – reinforced by instructions from

Defendants not to communicate directly with the Russian Federation space agencies – prevented Plaintiff from learning of Defendants' misrepresentations.

8.  Space Adventures terminated the Agreement on or about March 24, 2015. Space Adventures retained the $7 million that Mr. McPike had already paid.

9.  After Space Adventures' termination of the Agreement, Mr. McPike sought to arrange a circumlunar flight directly with the Russian Federal Space Agency, known by then as Roscosmos.

10.  In the course of his communication with Roscosmos, Mr. McPike learned that Space Adventures had no agreements with the Russian Federation space agencies for providing circumlunar flights to private individuals. Mr. McPike also learned that the Russian space agencies' planning efforts for potential circumlunar flight were in the earliest stages and that it would not have been possible for the Russian space agencies to undertake circumlunar flight within the six to eight year time frame represented by Defendants, or for many years thereafter – if at all.

11.  Defendants' acts and omissions constitute breach of contract, fraud in the inducement of a contract and violation of the Virginia Consumer Protection Act of 1977 (the "VCPA"), or, in the alternative, conversion or unjust enrichment.

12.  As a result of Defendants' unlawful conduct, Plaintiff is entitled to an award on his various causes of action of his actual and statutory damages, punitive damages, attorneys' fees, and the costs of bringing this action.

## THE PARTIES

13.  Plaintiff Harald McPike is a citizen of the Republic of Austria, with his domicile in the Commonwealth of the Bahamas.

14.     Defendant Zero-Gravity Holdings, Inc. is a corporation formed under the laws of the State of Nevada with its principal place of business in the Commonwealth of Virginia at 4601 North Fairfax Drive, Suite 1200, Arlington, Virginia 22203. Until January 2017, Zero-Gravity Holdings, Inc. was named Space Adventures Ltd. Zero-Gravity Holdings, Inc. holds a certificate of authority to transact business in Virginia.

15.     On information and belief, Defendant Thomas Shelley was President of Space Adventures at all material times, and on information and belief continues in that position. On information and belief, Mr. Shelley is a citizen of the Commonwealth of Virginia with an address in this judicial district and division at 1551 Regatta Lane, Reston, Virginia 20194.

16.     On information and belief, Defendant Eric Anderson was a member and Chairman of the Board of Space Adventures and its Chief Executive Officer at all material times, and continues in those positions. On information and belief, Mr. Anderson is a citizen of the State of Washington with an address at 113 Cherry Street, Apt. 24599, Seattle, Washington 98104. On information and belief, Mr. Anderson maintains a residence in this judicial district and division at 1605 Ashgrove Meadows Way, Vienna, Virginia 22182.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(2), as (i) Plaintiff is a citizen of the Republic of Austria, a foreign state, and on information and belief (ii) Defendant Space Adventures is a citizen of the Commonwealth of Virginia pursuant to 28 U.S.C. § 1332(c)(1), (iii) Defendant Mr. Shelley is a citizen of the Commonwealth of Virginia, (iv) Defendant Mr. Anderson is a citizen of the State of Washington and (v) the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

18.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims arose in this judicial district and division, wherein Defendant Space Adventures is headquartered and Mr. Shelley resides.  In the alternative, venue is proper in this Court under 28 U.S.C. § 1391(b)(3), as each Defendant is subject to the personal jurisdiction of this Court.

## GENERAL ALLEGATIONS

**Defendants Tell Mr. McPike That Space Adventures Has The Rights
To A Circumlunar Mission That Can Take Place Within 6 to 8 Years**

19.    Mr. McPike is a private investor and an adventurer.  He has undertaken skiing expeditions to the North and South Pole, and scaled Mt. Kilimanjaro, Mt. Chimborazo, and Lhakpa-Ri in the Himalayas.  Mr. McPike sees a space flight as the culmination of his explorations.

20.    Space Adventures had a history of successfully sending private citizens to the International Space Station on Russian space missions.  Space Adventures provided eight space flights to seven individuals between 2001 and 2009.

21.    In or about July 2012, Mr. McPike, through an associate, contacted Space Adventures indicating interest in the circumlunar mission.

22.    Roxanne Trust of Space Adventures responded by email on July 30, 2012:

> Prices for our circumlunar mission over the next several years start around US$150,000,000.   There are many factors that impact pricing, including the year of the launch, mission duration, and the mission profile.  We can also arrange for an orbital spaceflight and the cost for this starts around US$50,000,000.
>
> I will be happy to discuss program details and conditions with you. Please let me know if spaceflight is something you would like to do in the next 2-5 years.

23.     Space Adventures insisted that Mr. McPike enter into a Mutual Non-Disclosure Agreement ("NDA") as "one of the first steps [it] takes with a prospective client." Mr. McPike and Space Adventures entered into the NDA on or about August 6, 2012. The NDA forbade the parties from disclosing Confidential Information, as broadly defined in the NDA, other than to officers, directors, employees and contractors on a "need to know" basis.

24.     After signing the NDA, Mr. McPike submitted a medical questionnaire and engaged in several emails and conversations with Mr. Shelley and Mr. Anderson.

25.     On or about September 30 through October 1, 2012, Mr. Shelley and Mr. Anderson met with Mr. McPike and others in the Bahamas. In those meetings, Mr. Shelley and Mr. Anderson made clear that the circumlunar mission was expected to be accomplished in not more than 6-8 years. This timing was important to Mr. McPike because he was concerned that, the longer it would take for the mission, the greater the risk that he would not be able to go on it.

26.     On or about November 13, 2012, Mr. Shelley (copying Mr. Anderson) emailed a draft contract titled "Circumlunar Space Flight Purchase Agreement" to Mr. McPike. On the first page of the draft contract was the following recital (the "Ownership Representation"):

> WHEREAS, SA has reserved and owns the rights to provide a circumlunar space flight, after having obtained such rights from Rocket and Space Corporation Energia ("RSCE", the official operator of the Soyuz-TMA spacecraft and from the Russian Federal Space Agency ("RFSA"), the official entity designated by the sovereign government of the Russian Federation to operate human space flights via RSCE's Soyuz-TMA spacecraft and Soyuz-FG launch vehicles[.]

27.     This representation seemed entirely plausible given Space Adventures' prior history in sending private citizens to the ISS aboard Russian spacecraft and the efforts it was expending on the circumlunar mission.

28.     On or about November 19, 2012, in a telephone call with Mr. McPike's advisor, Mr. Anderson and Mr. Shelley represented that Space Adventures had an exclusive arrangement with the Russian Federation space agencies for a circumlunar mission, and that the trip could be accomplished within eight years.

29.     The draft contract identified a purchase price of $150 million, payable in several installments.

30.     Thereafter, the parties engaged in negotiations over the terms of the contract, in particular initially over the financial terms and term/termination provisions.   By email dated November 21, 2012, Mr. Anderson proposed a six-year term for the contract, subject to a two year extension if there had been "adequate progress along the way." Mr. Anderson's email, and the draft contract embodying the term change, constituted a precontractual representation that Mr. McPike's Circumlunar Mission could reasonably be accomplished within six to eight years (the "Timing Representation").

31.     On December 20, 2012, Mr. McPike (through his advisor) by email requested to Mr. Shelley and Mr. Anderson that Space Adventures "[p]lease repeat this recital [the Ownership Recital] as an operative provision in the agreement, by making a Representation to this effect."

32.     Defendants did so, in a revised draft agreement sent to Plaintiff's advisor on January 17, 2013 that included a new Section 3.09 entitled "Representation and Warranty" stating:

> SA represents and warrants that it has reserved and owns the rights to provide a circumlunar space flight, after having obtained such rights from Rocket and Space Corporation Energia ("RSCE"), the official operator of the Soyuz-TMA spacecraft and from the Russian Federal Space Agency ("RFSA"), the official entity designated by the sovereign government of the Russian Federation to operate human space flights via RSCE's Soyuz-TMA spacecraft and Soyuz-FG launch vehicles.

- 7 -

33.     Defendants also informed Mr. McPike that Anousheh Ansari, a wealthy entrepreneur who had previously traveled to the International Space Stations on a mission arranged through Space Adventures, would be participating in the same space flight. Ms. Ansari's apparent participation in the Circumlunar Mission gave further credibility to Space Adventures' representations concerning the Circumlunar Mission, particularly because Mr. McPike understood that the Circumlunar Mission would require two Space Adventures participants.

34.     Contract negotiations continued, and the parties ultimately reached agreement on terms.

**Space Adventures and Mr. McPike Enter Into The Circumlunar Space Flight Agreement**

35.     Mr. McPike executed the Agreement on or about March 20, 2013. A copy of the Agreement is attached hereto as Exhibit 1 and incorporated herein by reference. Mr. McPike was induced to enter the Agreement in reliance on Defendants' precontractual representations that (i) Space Adventures owned the rights to provide him a circumlunar space flight, obtained from the official Russian space agencies with the authority to operate such a flight and (ii) that, at the time the representation was made, such a flight was reasonably achievable within six years and not more than eight years. As it turned out, neither precontractual representation was true.

36.     The Agreement included Section 3.09 unchanged from the November 13, 2012 draft.

37.     The Agreement provided for payment of $150 million for the Circumlunar Mission as follows.

38.     The "Contract Deposit" of $30 million would be payable in three installments. The first installment (the "Contract Deposit-First Installment") of $7 million was due within ten business days of execution of the agreement. Agr. § 5.02.01(i). The second installment (the

"Contract Deposit-Second Installment") of $8 million would be due one year from the execution date of the Agreement. Agr. § 5.02.01(ii). The third installment (the "Contract Deposit-Third Installment") of $15 million would be due on the later of one year from the execution date of the agreement or ten business days after delivery of the "Lunar System Design Review" ("LSDR") to Mr. McPike. Agr. § 5.02.01(iii).

39.     The LSDR was described as a document that "shall delineate the plans of SA, RFSA, and RSCE with regard to the Circumlunar Mission." The particular subjects to be covered by the LSDR were specified in the Agreement. Agr. § 3.03.03. The LSDR was to be completed "approximately seven to eight months after the Execution Date of the" Agreement.

40.     Mr. McPike was to make a subsequent payment of $60 million "upon receipt of written notice from RFSA that the Circumlunar Mission will occur with the Client as a member of the Mission Crew and specifying the intended launch period for the Mission which includes the Planned Launch Date. This notice is expected to occur eighteen months after the Execution Date of this Agreement, and not before June 30, 2014." Agr. § 5.02.02.

41.     Mr. McPike was then to make a payment of $30 million "within 10 business days of the start of Space Flight Training." Agr. § 5.02.03. Mr. McPike's final payment of $30 million would be due "ninety (90) days prior to the Planned Launch Date." Agr. § 5.02.04.

42.     The Agreement by its terms would terminate on December 31, 2018, unless Mr. McPike had "received either (i) the confirmation of launch notice from RFSA referred to in Section 5.02.02 or (ii) the training schedule referred to in Section 3.02.02," in which case the term would be extended to December 31, 2020. Agr. § 7.01.

43.     As relevant here, the Agreement could be terminated by Space Adventures in the event Plaintiff failed to make payments or materially breached the Agreement, in which case

- 9 -

Space Adventures could retain all payments made by Mr. McPike as liquidated damages. Agr. § 7.02.01.

44. For his part, Mr. McPike could terminate the Agreement "due to change of thoughts or change of heart," and if he did so prior to payment of the Contract Deposit-First Installment and Contract Deposit-Second Installment, he would forfeit the $7 million Contract Deposit-First Installment but would have no further payment obligation. Agr. § 7.03.01.

45. Finally, if Mr. McPike terminated the Agreement because the Circumlunar Mission "had not been initiated by December 1, 2018 due to RSCE's or RFSA's non-performance or material default," Mr. McPike could terminate the Agreement and Space Adventures would be obligated to refund all payments other than the Contract Deposit-First Installment. Agr. § 7.03.02.

46. The Agreement required Mr. McPike to not disclose or use proprietary information of Space Adventures. Agr. § 7.03.02. The Agreement defines "SA Confidential Information":

> The Client hereby acknowledges and agrees that the proprietary information referred to herein shall include, without limitation, this Agreement (particularly Articles 5-8), SA-developed technical information regarding the ISS, the Soyuz or the Lunar Complex; SA-developed training materials; SA-developed project and mission ideas, concepts, or technical information; financial and marketing information; customer, partner, vendor and developer names and contact information; business, technical, marketing, and financing strategies; business trade secrets, events, and plans, reports, calculations, studies and other types of confidential and proprietary information provided to the Client ("SA Confidential Information")

Agr. § 6.02.01.

47.     Mr. McPike could only provide SA Confidential Information to the RFSA or other agencies ("ISS Partners") if he "must" provide it "in order to successfully provide the Space Flight Experience for the Client." Agr. § 6.02.03

48.     Moreover, the Agreement contained a strict non-circumvention provision, which provided that, during the term of the Agreement, Mr. McPike could not "attempt to work or to work with SA's vendors and providers directly without SA's involvement." Agr. § 6.02.04.

49.     The effect of the Agreement's confidentiality and non-circumvention provisions was to prevent Mr. McPike from independently contacting the RFSA or RSCE (or anyone else) with any questions, concerns or other inquiries about the circumlunar mission.

50.     The Agreement is governed by Virginia law, and chooses the state and federal courts sitting in Virginia as the exclusive forum for legal actions arising out of it, providing that neither party shall contest jurisdiction or venue in those courts. Agr. § 8.09.

51.     Mr. McPike paid the Contract Deposit-First Installment amount of $7 million on or about March 28, 2013.

**The Contract Goes Sour**

52.     After execution of the Agreement, Mr. McPike undertook substantial activity in furtherance of the planned Circumlunar Mission, including medical examinations and review of purported technical materials, as well as continuing discussions with Space Adventures concerning such topics as mission risks and sponsorship parameters.

53.     The LSDR was not, as contemplated by the Agreement, completed within six to eight months of execution of the Agreement, that is, around November 2013. Instead, with Space Adventures' coordination, in mid-January 2014, Mr. McPike and an associate traveled to Moscow for a meeting concerning development of the LSDR at the offices of RSCE. Tom Shelley, Eric Anderson and, on information and belief, other personnel of Space Adventures and

- 11 -

persons identified as personnel of RSCE, but not RFSA, participated in these meetings.  In an email dated December 21, 2013, Mr. Shelley, copying Mr. Anderson, cautioned Mr. McPike not to raise questions concerning a possible spacewalk in those meetings.

54.     In early February 2014, Mr. Shelley sent Mr. McPike a "Lunar Mission – Trajectory Analysis" purportedly identifying launch windows for the Circumlunar Mission  in the time period 2017-2019.  As Mr. McPike later learned, the Defendants knew when they made that representation that launch dates in that time period were not realistically achievable.

55.     As the one-year anniversary of the execution of the Agreement, and therefore the time for payment of the Contract Deposit-Second Installment of $8 million approached, Mr. McPike expressed concerns to Mr. Shelley and Mr. Anderson about the timing of payments versus the risks of the project.  In part, Mr. McPike was concerned about risks related to making payments to Space Adventures – which was essentially acting as a travel broker — when the actual spaceflight services were to be provided by RSCE and RFSA.

56.     In light of Mr. McPike's concerns, Defendants proposed to extend the due date of the Contract Deposit-Second Installment until after the LSDR presentation planned for June 2014.  Defendants also agreed to extend the due date of the Contract Deposit-Third Installment from ten business days after provision of the LSDR to 30 calendar days.  Space Adventures told Mr. McPike that the Russian space agencies had agreed that the mission would continue even if Ms. Ansari dropped out, though Space Adventures believed she was committed to the mission.

57.     In or about mid-June 2014, Mr. McPike again traveled to Moscow for a presentation regarding the LSDR.  On information and belief, personnel from RSCE were involved in meetings surrounding the presentation of the LSDR, but no personnel of RFSA were present.

58.     Discussions over revising the payment schedule to reduce counterparty risk on both sides continued. In early July, 2014, Mr. McPike proposed arrangements under which he would put the payments due to Space Adventures (a significant part of which Space Adventures would be expected to pay over to RSCE and RFSA for the space flight and preparations) into a letter of credit with a bank, with payments to be released by the bank on achievement of identified milestones. Such an arrangement would have required the express assent and participation of RFSA and RSCE. Mr. McPike was willing to increase the contract price by $20 million – to $170 million – in the event the parties agreed to such an arrangement. By email dated July 9, 2014, Eric Anderson told Mr. McPike that the proposal would be discussed with the Russian space agencies.

59.     In his proposal email, Mr. McPike asked Mr. Shelley and Mr. Anderson to comment on a report in the English-language Russian publication Moscow Times to the effect that RFSA/Roscosmos had not been consulted by Space Adventures with respect to a circumlunar mission. Mr. Anderson responded orally to Mr. McPike that the article was not correct, and that Roscosmos had a new head who was not aware of the arrangement with Space Adventures.

60.     In an email dated October 11, 2014, Space Adventures advised Mr. McPike that it was not willing to include the RFSA and RSCE in a contract amendment. Despite further discussions, Space Adventures never entered into an amendment of the Agreement.

61.     Instead, by notice dated March 24, 2015, Space Adventures terminated the Agreement. Space Adventures has retained the Contract Deposit-First Installment of $7 million.

**Mr. McPike Discovers Defendants' Fraud and Breach of Contract**

62.     After Space Adventures terminated the Agreement, Mr. McPike continued efforts to seek a circumlunar flight aboard a Russian spacecraft. Ultimately, in May 2016, Mr. McPike,

contacted Roscosmos (the successor agency to RFSA), seeking to discuss a circumlunar flight

with Roscosmos and referencing his arrangement with Space Adventures, which Mr. McPike

understood that Space Adventures had discussed with Roscosmos at least in connection with his

proposals to amend the Agreement.

63.     By letter dated July 25, 2016, Roscosmos responded to Mr. McPike, stating, in

relevant part:

> With regard to our relationship with Space Adventure (sic), Ltd,
> (S.A.) we would like to note that Roscosmos has successfully
> conducted 7 commercial space flights on the Russian "Soyuz"
> manned transport vehicle with the involvement S.A.  At present,
> however, there are no valid documents containing any legal
> obligations of Roscosmos to S.A.  Unfortunately, until receiving
> your letter, Roscosmos had no information about your contract
> with S.A.

64.     Roscosmos also explained the state of planning Moon exploration:

> Regarding your participation in a space flight around the Moon, we
> would like to inform you that at present Roscosmos is considering
> future projects concerning lunar exploration (some of which would
> involve the participation of international partners), including the
> possibility of manned flights to the Moon, the establishment of a
> circumlunar orbital base and a manned lunar landing.
> Nevertheless, such projects are only in the preliminary planning
> phase.   The decision regarding whether to initiate practical
> implementation of these projects will be made later, after detailed
> consideration of the entire range of questions associated with the
> human lunar flights, especially with regard to safety.

65.     Thus, for the first time, Mr. McPike learned that Space Adventures' pre-

contractual representations and contractual representation and warranty concerning its ownership

of rights to provide a circumlunar flight were likely false, and that a circumlunar mission, far

from being sufficiently advanced and certain to proceed to completion within 6-8 years from

2013, even in 2016 was not on the drawing board.

66.     Mr. McPike followed up on Roscosmos' July 25 letter, meeting with Roscosmos in early October 2016. After that meeting, in November 2016, Mr. McPike sent Roscosmos written questions concerning Space Adventures' relationship with the Russian space agencies in respect of a circumlunar mission.

67.     Roscosmos responded on December 26, 2016: "Unfortunately, we are unable to provide you with information on relationships with "Space Adventures," as such information is confidential and may not be disclosed to third parties. *In addition, neither the current nor previous Federal Space Programs of the Russian Federation envisaged implementation of projects associated with manned missions to the Moon.*" (emphasis added).

68.     Roscosmos' letter of December 26, 2016 thus finally and authoritatively confirmed that Space Adventures had not "reserved" and did not "own[]" the rights to provide a circumlunar space flight, after "having obtained such rights from" RSCE and RFSA, and that in fact the Russian space agencies had not ever planned a manned circumlunar flight. Mr. McPike's dealings with Space Adventures were thus predicated on untruths.

## CAUSES OF ACTION

### Count I
### Breach of Contract Under Virginia Law (against Space Adventures)

69.     Mr. McPike repeats and realleges the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

70.     On or about March 20, 2013, Mr. McPike entered into the Agreement with Space Adventures. The Agreement created a binding legal obligation between the parties.

71.     Section 3.09, quoted in full in paragraph 32, constituted a contractual representation and warranty that Space Adventures owned and had reserved the rights to provide a circumlunar space flight, and had obtained such rights from RSCE and RFSA.

72.    That representation and warranty was not true at the time the parties entered into the Agreement or at any time thereafter, in that Space Adventures had not obtained such rights from both of RSCE and RFSA.

73.    Space Adventures failure to satisfy Section 3.09 was a breach of the Agreement. In essence, Space Adventures sold Mr. McPike something it did not own – a seat on a Russian circumlunar space mission.

74.    Space Adventures' breach of the Agreement has damaged Mr. McPike. Mr. McPike paid Space Adventures the $7 million Contract Deposit-First Installment on the contractual basis that Space Adventures had the rights to provide him with the opportunity to participate in the first circumlunar space flight arranged by SA. Space Adventures was not, in fact, able to promise a participation in a circumlunar space flight because it did not own the rights it represented and warranted that it owned.

75.    As a result of Space Adventures' breach of the Agreement, Mr. McPike has been damaged in at least the amount of $7 million.

### Count II
### Fraud in the Inducement of a Contract (against all Defendants)

76.    Mr. McPike repeats and realleges the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

77.    Defendants committed fraud in the inducement of a contract by making false and fraudulent representations to Mr. McPike, with intent to defraud Mr. McPike in two ways. First, Defendants defrauded Mr. McPike by representing to him, with the Ownership Representation, that Space Adventures owned and had reserved the rights from RSCE and RFSA to provide the opportunity for a circumlunar space flight. This representation of an existing fact was false. Second, Defendants defrauded Mr. McPike by representing to him, with the Timing

Representation, that the circumlunar flight was achievable within six to eight years from entry into a contract for such flight. This was also a false representation of an existing fact. Alternatively, this was a promise that Defendants knew, at the time they made the promise, they had no intention of fulfilling and would never fulfill. At the time they made the representation, the Defendants knew that they did not have the rights to such a flight and that, even if they did manage to acquire the rights to such a flight, the flight could not be accomplished within six to eight years because the Russian space authorities' planning with respect to Moon missions was, at best, not sufficiently definite or advanced that such a mission could have been accomplished within that time frame.

78.     Those representations were false in fact and known to be false by Defendants at the time they were made. Defendants made these representations to Mr. McPike with the intention that Mr. McPike would rely upon them and be induced into entering into the Agreement with Space Adventures.

79.     Defendants Mr. Shelley and Mr. Anderson together engaged in a concerted plan of misrepresentations to Mr. McPike to induce him into entering into the Agreement.

80.     Mr. McPike did in fact rely upon Defendants' misrepresentations, which were critical to his willingness to enter into a contract with Space Adventures for a circumlunar space mission. Mr. McPike would not have entered into a contract for such a flight if he had known that Space Adventures did not have the rights necessary to offer him such a flight. Mr. McPike also would not have entered into a contract for a circumlunar space flight at a time more distant in the future than six to eight years given his age and health, factors known to Defendants.

81.     Defendants reaffirmed their fraudulent misrepresentations during the life of the Agreement, falsely affirming that the mission planning was meaningfully in process when it was not.

82.     In order to conceal their fraud from Mr. McPike, the Defendants utilized the NDA, the confidentiality provisions of the Agreement and the non-circumvention provision of the Agreement, as well as oral and written warnings, to prevent Mr. McPike from making direct contact with the Russian space agencies. Defendants thus made it impossible for Mr. McPike to discover their fraud within the limitations period despite the exercise of due diligence. Moreover, the effort required to establish contact with Roscosmos and obtain information from it meant that the discovery of the fraud was a slow and time-consuming process.

83.     Mr. McPike only learned of the falsity of Defendants' representations in the course of his communications with Roscosmos concerning a circumlunar mission. The earliest time that Mr. McPike had any knowledge of Defendants' fraud was July 25, 2016, and it was only after continuing communications and follow up with Roscosmos that Roscosmos confirmed the facts of Defendants' fraud on December 26, 2016.

84.     The falsity of Defendants' representation that Space Adventures had obtained the rights to a circumlunar mission from RSCE and RFSA is shown in Roscosmos' letter of December 26, 2016, stating that "neither the current nor previous Federal Space Programs of the Russian Federation envisaged implementation of projects associated with manned missions to the Moon."

85.     The falsity of Defendants' representation that a circumlunar mission could be completed within six to eight years is shown in Roscosmos' letter of July 26, 2016, stating that any moon project, including a circumlunar mission, a manned lunar landing, or the establishment

- 18 -

of a circumlunar orbital base were at that time – three years after execution of the Agreement – "only in the preliminary planning phase" and that "[t]he decision regarding whether to initiate practical implementation of these projects will be made later." Thus, on information and belief, in the fall of 2012 and in the spring of 2013, the Russian space agencies had no firm plan, and had undertaken at most only preliminary planning (and possibly not even that), for a possible manned circumlunar mission.

86.     Defendants' fraud has damaged Mr. McPike. Mr. McPike was induced to enter into the Agreement, which required him to pay Space Adventures the $7 million Contract Deposit-First Installment, on the basis of Defendants' representations that Space Adventures had the rights to provide him with the opportunity to participate in the first circumlunar space flight arranged by Space Adventures, and that such flight could be expected to take place within six to eight years.

87.     As a result of Defendants' fraud, Mr. McPike has been damaged in at least the amount of $7 million.

88.     Defendants acted with actual malice toward Mr. McPike. Mr. McPike is therefore entitled to an award of punitive damages against Defendants for their fraud against him.

### Count III
### Violation of the Virginia Consumer Protection Act (against all Defendants)

89.     Mr. McPike repeats and realleges the allegations contained in paragraphs 1 through 88 as if fully set forth herein.

90.     The aforementioned false representations made by the Defendants also constitute a violation of the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-196 et seq. ("VCPA").

91.     Space Adventures is a "supplier" as defined by § 59.1-198, as it is a "seller...who advertises, solicits, or engages in consumer transactions." *See Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 456 (E.D. Va. 2009).

92.     The Agreement constituted a "consumer transaction" as defined by § 59.1-198, in that the Agreement was an "advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes." The Agreement provided services as defined by § 59.1-198, in that by offering to provide Mr. McPike with the Circumlunar Mission, Space Adventures provided "work performed in the business or occupation of the supplier." *See Enomoto*, 624 F. Supp. 2d at 456.

93.     The subject transaction is therefore regulated by the VCPA.

94.     Mr. Shelley and Mr. Anderson actively participated in the conduct of Space Adventures' affairs, and personally conducted Space Adventures' affairs in an illegal manner. They are therefore subject to individual liability under the VCPA.

95.     The aforementioned acts by Defendants constitute prohibited practices under the VCPA. The VCPA provides that it is unlawful for a supplier to misrepresent "goods or services as those of another" (§ 59.1-200(1); or "the affiliation, connection, or association of the supplier, or of the goods or services, with another" (§ 59.1-200(3)). Section 59.1-200(14) provides that it is unlawful for a supplier to use "any other deception, fraud, false pretense, false promise, or misrepresentation" in connection with a consumer transaction. *See Enomoto*, 624 F. Supp. 2d at 456.

96.     Defendants violated the VCPA by their acts and omissions in falsely and fraudulently and with intent to defraud making the Ownership Representation and the Timing Representation to the Plaintiff. These representations were (i) untrue and constituted false

representations; (ii) misrepresentations of material facts on the basis of which Mr. McPike paid the $7 million Contract Deposit-First Installment; (iii) known to Defendants when Defendants made them; (iv) made with the intent to mislead Plaintiff into believing that Space Adventures owned the rights necessary and sufficient to sell Mr. McPike a seat on a circumlunar mission within a six to eight year time frame; and (v) believed to be true and justifiably relied upon by Plaintiff in performing under the Agreement.

97.    As a direct and proximate result of Defendants' violation of the VCPA, Mr. McPike has suffered actual damages in the amount of $7,000,000. Pursuant to VCPA § 59.1-204(A), Plaintiff may recover these actual damages. Defendants' violation was willful. Consequently, Plaintiff may be awarded treble damages pursuant to VCPA § 59.1-204(A) and an award of reasonable attorneys' fees and court costs pursuant to VCPA § 59.1-204(B).

**Count IV**
**Trover and Conversion (against all Defendants)**

98.    Mr. McPike repeats and realleges the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

99.    Defendants, by the fraudulent misrepresentations and acts detailed herein, wrongfully assumed or exercised authority over Mr. McPike's property, the $7 million Contract – First Deposit, thereby depriving Mr. McPike of possession over his property. Defendants by their misrepresentations conspired to deprive Mr. McPike of his property and to continue the exercise of authority over his property, and by their fraudulent misrepresentations violated the common law duty not to defraud others. Moreover, Mr. Shelley and Mr. Anderson actively participated in the conduct of Space Adventures' affairs, and personally conducted Space Adventures' affairs in an illegal manner. They are therefore subject to individual liability for trover and conversion.

100.   As a result of Defendants' conversion of the Contract Deposit-First Installment, Mr. McPike has been damaged in at least the amount of $7 million.

101.   Defendants acted with actual malice toward Mr. McPike, or acted under circumstances amounting to a willful disregard of Mr. McPike's rights.  Mr. McPike is therefore entitled to an award of punitive damages against Defendants for their conversion of his property.

### Count V
### Unjust Enrichment (against Space Adventures)

102.   Mr. McPike repeats and realleges the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

103.   Space Adventures has in its possession the Contract Deposit-First Installment in the amount of $7 million, which has come into its possession under circumstances which make it unjust for Space Adventures to retain it and which in equity and good conscience belongs to Mr. McPike.

104.   Space Adventures has been unjustly enriched in at least the amount of $7 million by retaining Contract-First Deposit.

### JURY DEMAND

105.   Plaintiff hereby demands a trial by jury on all issues and claims so triable.

### RELIEF REQUESTED

106.   WHEREFORE, Plaintiff Harald McPike respectfully requests that this Court enter judgment in his favor and against Defendants on the Complaint and enter an order as follows:

      (a) On Count I of the Complaint, awarding Mr. McPike damages against Space Adventures in the amount of at least $7,000,000, according to proof at trial; and

      (b) On Count II of the Complaint, awarding Mr. McPike damages against all

Defendants in the amount of at least $7,000,000 and punitive damages in an amount such as the Court shall find to be just, according to the egregious and malicious willful conduct of Defendants; and

(c) On Count III of the Complaint, awarding Mr. McPike damages against all Defendants in the amount of at least $7,000,000 and treble damages, reasonable attorneys' fees and court costs pursuant to the VCPA; and

(d) On Count IV of the Complaint, , awarding Mr. McPike damages against all Defendants in the amount of at least $7,000,000 and punitive damages in an amount such as the Court shall find to be just, according to the egregious and malicious willful conduct of Defendants; and

(e) On Count V of the Complaint, awarding Mr. McPike damages against Space Adventures in the amount of at least $7,000,000, according to proof at trial; and

(f) Awarding Mr. McPike prejudgment and post judgment interest; and

(g) Granting such other relief as the Court deems just and proper.

Dated: May 17, 2017

Respectfully submitted,

CLARE LOCKE LLP

By: *[signature]*

Thomas A. Clare (VSB # 39299)
Megan L. Meier (VSB # 88720)
10 Prince Street
Alexandria, Virginia 22314
Tel.: (202) 628-7400
tom@clarelocke.com
megan@clarelocke.com

and

SEWARD & KISSEL LLP
Bruce G. Paulsen (*pro hac vice* pending)
Jeffrey M. Dine (*pro hac vice* pending)
1 Battery Park Plaza
New York, New York 10004
Tel.: (212) 574-1200
paulsen@sewkis.com
dine@sewkis.com

*Attorneys for Plaintiff*
*Harald McPike*