1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


------------------------------x
                              :
HARALD McPIKE                 :
                              :
                  Plaintiff   :
                              :
        versus                : Civil Action Number
                              :
ZERO-GRAVITY, et al           : 1:17-CV-562
                              :
                  Defendants.:
------------------------------x

                            February 23, 2018

        The above-entitled Motions Hearing was continued
before the Honorable John F. Anderson, United States District
Magistrate Judge.

                THIS TRANSCRIPT REPRESENTS THE PRODUCT
                OF AN OFFICIAL REPORTER, ENGAGED BY THE
                COURT, WHO HAS PERSONALLY CERTIFIED THAT
                IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
                THE CASE AS RECORDED.

1                        A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3                   DUSTIN ANDREW PUSCH, Esquire
                    Clare Locke LLP
4                   10 Prince Street
                    Alexandria, VA 22314
5
                    PAUL KOEPP, Esquire
6                   Seward & Kissel
                    1 Battery Park Plaza
7                   New York, New York 10004

8
     FOR THE DEFENDANTS:
9
                    RAYMOND KENNON POTEAT, III, Esquire
10                  SHAWN DOUGLAS, Esquire
                    Williams & Connolly LLP (DC)
11                  725 12th St NW
                    Washington, DC 20005
12
                    KEVIN QUILTY, Esquire
13                  Pillsbury Winthrop Shaw Pittman, LLP
                    1200 Seventh Street NW
14                  Washington, DC 20036

15

16

17

18

19

20

21
     OFFICIAL UNITED STATES COURT REPORTER:
22
                    MS. TONIA M. HARRIS, RPR
23                  United States District Court
                    Eastern District of Virginia
24                  401 Courthouse Square
                    Ninth Floor
25                  Alexandria, VA 22314
                    703-646-1438

3

1        **P R O C E E D I N G S**

2    (Call to order of the Court at 10:21 a.m.)

3            THE DEPUTY CLERK:  Harald McPike versus Zero-Gravity

4    Holdings, Inc. et al.  Civil Case Number 1:17-CV-562.

5            MR. PUSCH:  Good morning, Your Honor.  Dustin Pusch

6    from the law firm of Clare Locke on behalf of the plaintiff,

7    Harold McPike.

8            I'm here with my colleague, Paul Koepp, from the law

9    firm of Seward & Kissel also on behalf of Harold McPike.

10           THE COURT:  Thank you.

11           MR. POTEAT:  Good morning, Your Honor.  Kennon

12   Poteat and Shawn Douglas of Williams & Connolly for defendants

13   Eric Anderson and Tom Shelley.

14           MR. QUILTY:  Kevin Quilty for co-defendants,

15   Zero-Gravity Holdings.

16           THE COURT:  Okay.  Thank you.  All right.  Well I've

17   read everybody's pleadings related to this issue.  And, you

18   know, I guess we're now down to eight unique documents.  Then,

19   the limitation now has been, as I understand it, really to the

20   identity of the one client who has a current pending agreement

21   and the lists of prospective customers, all of which relate to

22   a time period after March of 2015 when the agreement with Mr.

23   McPike had been terminated.

24           MR. PUSCH:  That's correct, Your Honor.  I think the

25   party's have worked diligently with one another to try to

4

1    narrow this as much as possible.

2           But what is at issue right now is the identity of

3    this circumlunar client.  And to be clear, this is the client

4    who replaced the plaintiff on this circumlunar trip.  Mr.

5    McPike his contract was terminated by Space Adventures and the

6    defendants.  And soon thereafter they began looking for new

7    clients.  They found, apparently, this other client and I

8    believe they also are sticking -- considering other

9    prospective clients.  I think those are at issue as well.

10   It's unclear whether or not the redactions are just the

11   current circumlunar client or it's a circumlunar client and

12   some other prospective clients as well.

13          But the -- I believe that there was a lot of motion

14   practice with regards to whether relevancy -- or whether

15   redactions for relevancy and confidentiality in general are

16   proper.  I think at this point we are now at the fact that

17   this information, this circumlunar client, is relevant to this

18   action and therefore the redactions are improper.

19          THE COURT:  Tell me why you think an agreement with

20   somebody who has entered into after March 25, which was two

21   years after he entered into the agreement or almost two years

22   after he actually entered into the agreement, that the actual

23   identity of that person is relevant.

24          MR. PUSCH:  Well, the fact of the matter is that

25   plaintiff Harold McPike, the most blatant example of why it's

1   relevant, is with punitive damages.  It's well settled.  The

2   Supreme Court has -- the Eastern District of Virginia has

3   determined, as affirmed by the Fourth Circuit, that behavior

4   with regards to other people -- other customers after the

5   fact, that is relevant to whether or not the fraudulent

6   behavior or the behavior that would yield punitive damages has

7   been continued.  It's been persistent and it's been repeated.

8   And it's not so much the identity of this individual is so

9   critical, it's what -- we are entitled -- Mr. McPike is

10  entitled to probe what that individual knows.

11          Now regarding confidentiality, we're not going to

12  disclose any confidential information, but we need to be able

13  to reach out to this individual and say:  Do you know who Mr.

14  McPike is?  Has -- you know, are you familiar with Space

15  Adventures?

16          THE COURT:  There's already been deposition

17  testimony that this my -- and I may be misreading this, but

18  the way I read it was that this lawsuit had been discussed

19  with this individual.  Am I misstating that?

20          MR. PUSCH:  That's their testimony.  I would -- I

21  would say that we -- the -- the defendants want us to take

22  their own party's and their party's representatives word for

23  what was discussed.  Mr. McPike is entitled to pressure-test

24  what the defendants are saying by asking this third party, you

25  know:  What did you discuss?  What are the parameters of your

1   agreement?  Are they still claiming that Roscosmos has an

2   agreement with them?  Are they not?  Is it persistent

3   behavior?

4          The contents of their agreement is relative to the

5   punitive damages claim in this case that they are still

6   persisting on claiming they have agreements that they don't

7   have and duping additional clients out of money.

8          THE COURT:  One other individual.

9          MR. PUSCH:  One other individual.  That's relevant

10  to punitive damages.  Their persistent behavior.

11         THE COURT:  How do you think you're going to get any

12  of that information since discovery is over in seven hours?

13         MR. PUSCH:  Well, I think we're entitled to contact

14  that individual.  If that individual is in Virginia, they're

15  under the subpoena power, we can still call them as a witness

16  for trial.  Simply because we haven't deposed them or gotten

17  documents from them, we're still entitled to pressure-test

18  what that individual knows.  Is it the same thing that the --

19  the defendants are claiming that they've discussed with this

20  individual?  Are the parameters of his contract, as they're

21  just claiming, it's the not the same, it was never discussed,

22  anything similar?  We're entitled to pressure-test what the

23  defendants are saying about that.

24         THE COURT:  Well, if this is so significant to you

25  as you -- as you have made it out to be over the last seven

7

1  days, when you found out in December that they were going to

2  be redacting the names of people and when you found out on

3  January 2nd when some of these documents were actually

4  produced with the redactions, why didn't you bring it to the

5  Court earlier?

6          MR. PUSCH:  Well, Your Honor, I would say that

7  there's one thing about redacting documents and it's quite

8  another about instructing witnesses not to answer the --

9          THE COURT:  We're not here on a motion to compel and

10  answer to a deposition.  We're here to produce a document,

11  with a -- without a redaction that you've had since January

12  2nd.  So, you know, this thing like they just didn't answer a

13  question in a deposition last week now makes this a timely

14  motion, I don't understand at all.  So help me understand why

15  you think a motion to compel, the production of a document

16  that you have had in your possession since January 2nd,

17  becomes timely when a witness doesn't answer a question last

18  week?

19          MR. PUSCH:  Well, I think, Your Honor what we

20  want -- the issue really became ripe for us to really push for

21  when defendant Anderson refused to answer the question.  When

22  that happened, we understood that we had no more avenues by

23  which to discover this information.  At that point we decided

24  that -- that was the last recourse to do this without the

25  Court's intervention.  And that's why we're seeking the

8

1   documents now.

2          If they -- Your Honor, it sounds like the 30(b)(6),

3   had we asked for that, that might have been something that

4   would be more appropriate.  We have asked for --

5          THE COURT:  It would have been timely.  I'm not

6   saying it would have been more appropriate.  You've known

7   about this issue clearly since the end of December.  You've

8   been sending e-mails back and forth about it since December.

9   You got a document, at least two of the eight documents that

10  are subject to this -- three of the eight documents that are

11  subject to this motion today, were produced to you on January

12  2nd with redactions.  You could have, if this was as

13  significant as you now indicate that it was, had a good faith

14  consultation and said, you know, within a week's period of

15  time brought that to the Court's attention and gotten a

16  decision.

17         MR. PUSCH:  Yes, Your Honor.  I would say that you

18  know, that given the time pressure of this Court, how quick it

19  is, and we appreciate that, you know, there certainly could

20  have been a more timely motion on it.  But, what really

21  happened was at the deposition on February 12th, when the

22  defendant Anderson was instructed not to answer this question,

23  that signaled to us that this -- they're not going to respond

24  to this in a deposition.

25         We've always understood that there was a difference

1    between what they were willing to produce in a document and

2    what they were willing to answer a direct question and

3    instruct against relevancy in a deposition.  When that

4    happened, that's when we understood that we are out of options

5    within the discovery process without Court's intervention to

6    obtain this information.  And that's when we moved the Court

7    for this information or we began our meet and confer with the

8    defendants on this issue.

9             I also wanted to note that we've withdrawn this

10   motion as to Zero-Gravity, defendant Zero-Gravity.  There was

11   some confusion about whether or not who had possession or

12   control over these documents, but the -- it may have been my

13   confusion -- but we've withdrawn this over Zero-Gravity.  So

14   it's just defendants Shelley and Anderson and then Space

15   Adventures.

16            THE COURT:  Well, help me understand, and again I've

17   read the e-mail chain that you all have attached as Exhibit 12

18   and maybe Exhibit 11 back and forth.  How having read the

19   party's positions relating to the documents -- how could it

20   have come as a surprise that they weren't going to disclose

21   the identity of the customer.

22            MR. PUSCH:  Well, I think that again that comes down

23   to what we perceive as a big difference between producing a

24   document and answering a question and then instructing not to

25   answer a question based on relevance in a deposition.  You can

1    object to a request for production for relevance and then the

2    party's can meet and confer on that and resolve that issue

3    between themselves, which is what happened.  We maintained our

4    objection for relevance over the request for production when

5    it was made with regards to this issue, but objecting for

6    relevance in a deposition, particularly where an individual is

7    doing the same exact trip or a very similar trip, and replace

8    the plaintiff on the very trip that's at issue in this case,

9    we were, quite honest, taken aback by that instruction in a

10   deposition.

11        And that's why when we saw that we realized that we

12   were out of options within the discovery process without the

13   Court's intervention.  And that's when we began meeting and

14   conferring again with the defendants on this issue.  But

15   that's -- we were genuinely taken by surprise that they would

16   instruct a witness not to respond for relevance in a 30(b)(6)

17   deposition that was part of one of the topics that was agreed

18   to.

19        THE COURT:  And just so it's clear, it wasn't just

20   relevancy, it was confidentiality.

21        MR. PUSCH:  Confidentiality.

22        THE COURT:  And that --

23        MR. PUSCH:  And there is a protective order in this

24   case that --

25        THE COURT:  But the defendants -- it's a one-tier

1   protective order.  Right?  So anything that's produced under

2   the protective order Mr. McPike would be able to see?

3          MR. PUSCH:  Yes, but that was agreed to by the

4   parties.

5          THE COURT:  But when the parties entered into that

6   agreement, they didn't say:  And we're going to provide you

7   with our customer list.  And at the time they didn't know the

8   situation of what was discussed in the opposition having to do

9   with his current negotiations and the possible impact of what

10  could happen if that customer was disclosed to other people.

11         MR. PUSCH:  Well, I think that the defendants always

12  knew that their client list was sensitive, that they're

13  claiming now.  That they knew they had competitors.  I don't

14  think that's a shock to them.

15         They knew that Mr. McPike had an interest and an

16  ongoing interest based on the complaint of going to the moon.

17  I don't think that it was a surprise to them.  But I also

18  think, Your Honor, if it makes sense, then this needs to be

19  produced in attorney's eyes only.  Mr. McPike is not

20  interested in using this for his own benefit as the defendants

21  have claimed.  We are interested in using it for this

22  litigation only.  And if it needs to be attorney's eyes only,

23  we're open to that.  We don't know why the defendants

24  didn't -- why they agreed to a confidentiality or a protective

25  order without that.  I think it's a little bit of buyer's

1  remorse.  But we are interested in the information in whatever

2  form we can get it for this litigation only.

3          THE COURT:  Okay.  Let me hear from who's going to

4  argue on behalf of the individual defendants?

5          MR. POTEAT:  So, Judge, we told opposing counsel

6  that we were not disclosing the identity of the current client

7  or any prospective clients at the end of December.  So they've

8  known that that information, from our standpoint, was off

9  limits and we reached a compromise on it.  And they didn't

10  pursue it until recently.

11          THE COURT:  Well, they have pursued it through -- I

12  mean these e-mails go back and forth until February 14th or

13  15th.  I mean there's, you know, we're going to redact; no

14  you're not; yes, you should; no, you shouldn't.  I mean, so

15  it's not like they in December they said okay that's fine with

16  us.

17          They didn't bring a motion.  I'll --

18          MR. POTEAT:  They didn't bring a motion.  And when

19  we responded to the discovery request, we put in there what we

20  were agreeing to do and we said this is based on a compromise.

21  I understand in their reply they say that they reserved their

22  rights, but I think their conduct indicates otherwise in terms

23  of the relevance.  And especially their claim now that it's

24  highly relevant.  Frankly, we just don't think that can be

25  accepted at that point.

1    If this information was highly relevant or a theory

2  of recovery depended upon it, a party would plead it in their

3  complaint.  And Mr. McPike didn't do that.  If the information

4  is highly relevant, a party would serve an interrogatory on it

5  on the first day fact discovery opened to seek the identities

6  of these people.  Mr. McPike did not do that.  If it was

7  highly relevant, a party would ask the defendant about it in a

8  deposition.  They deposed defendant Shawn Shelley in January.

9  They left two hours on the clock for the deposition.  Not once

10  did they ask him the identity of the current client or any

11  other prospective clients.  And then they deposed defendant

12  Eric Anderson on February 9th the same day that we were in

13  here arguing a motion two weeks ago.  They didn't ask him that

14  question either.  So the timing here is particularly suspect

15  because Your Honor granted a motion on February 9th compelling

16  them to disclose documents that they had improperly withheld

17  on privilege.  Mr. Mawdsley was excused from the deposition

18  that day because he was appearing as counsel when he was not

19  licensed.  Mr. McPike was there too.  And something happened

20  that weekend that has changed the tone of discovery in this

21  case in a negative way.  And it was on the following Monday

22  that they asked that question and they knew they were going to

23  get an objection to it, because we had told them that it was

24  off limits in December.  And that's what started the chain of

25  e-mails.

1          So we refused to answer the question on February

2    12th, the Monday after that ruling.  And then on -- on

3    Wednesday, February 14th is when we first heard the request to

4    unredact certain documents.

5          THE COURT:  I -- and you know they've redacted and

6    then they sent you some documents without the redactions and

7    they filed this motion.  You know, but we've got to get to the

8    heart of what -- what we're talking about.

9          Help me understand what documents you have produced

10   relating to -- I mean this draft for discussion document that

11   was part of the package that was exhibit -- the exhibit with

12   the documents that were in dispute -- where you got the

13   redaction on the -- I'm looking at 41-44 and 41-45 and 41-46.

14   At least part of that appears to be discussions relating to

15   the agreement or issues having to do with the agreement with

16   the client, is that right?

17         MR. POTEAT:  That is correct.  It's my understanding

18   that this is a -- a draft for discussion, questions for

19   Energia as it relates to the current client.

20         THE COURT:  What other documents -- I guess what I'm

21   trying to find out is, was the written agreement between the

22   current client asked for and produced in discovery in a

23   redacted format?

24         MR. POTEAT:  We agreed to produce in our responses

25   information relating to other clients up to the time of Mr.

1   McPike's default on his contract.  So the --

2           THE COURT:  Let me ask you.  When you actually

3   defaulted or when you terminated in March of 2015?

4           MR. POTEAT:  At the time of termination.  So March

5   of 2015.  And that's where we cut it off.  We realized that

6   certain documents after that date, so this is the document

7   that you reference from May of 2017, were produced.  We took a

8   broad cut at responsiveness when we produced documents in this

9   case.

10          And so, I will tell you I have a small thin binder

11  that has the documents with the current redactions on them

12  with a blue sheet and then you follow and the unredacted copy

13  is behind it in case you would want to review in camera to see

14  the exact information that has been redacted.  You know the --

15  the argument they have made as to relevant on punitives.  So

16  aside from the timing issue.

17          You know the only real hook -- the only potential

18  hook that they could have for this, I think would be if -- if

19  similar representations and warranties were made in the

20  current contract for the current client.  And the testimony

21  from the general counsel of Space Adventures and from the

22  president of Space Adventures that that -- that there is no

23  similar representation of warranty.

24          Counsel on the other side doesn't want to take their

25  word for it.  I have those agreements here.  We're happy to

1  submit them in camera as well for your review so that you can

2  confirm that.  I mean the representations is not the same.

3  And so there's no hook that this could possibly be relevant at

4  this point to open up a trove of discovery on the last day

5  when frankly on proportionality grounds, at this point, it's a

6  $7 million claim.  Extensive discovery has already occurred,

7  both in terms of documents and depositions.  They've had the

8  deposition of the other circumlunar client who is set to fly

9  with Mr. McPike.  They took that deposition.  We traveled to

10  San Francisco for it two weeks ago.

11        THE COURT:  All right.  I've read what you've

12  provided on that.

13        MR. POTEAT:  They have had the opportunity there.

14  And frankly at this point it is a -- it's a $150,000,000

15  contract here that they are attempting to interfere with at

16  this late stage, which they know is extremely sensitive, the

17  core sensitive information of Space Adventures.  And it seems

18  to be more of a play for leverage than a play for actual

19  discovery of information for use in the case.  But we do have

20  those documents if you'd like to review it.

21        I note in their reply they do not dispute that the

22  information is highly confidential and they don't dispute that

23  if disclosed harm would result, serious harm.  Both to --

24        THE COURT:  It's disclosed outside the stretchers of

25  the protective order.  They've acknowledged that.  I mean if

1  it's disclosed on the terms of the "protective order" and no

2  one discloses it outside the parameters of the protective

3  order or uses it for any other purposes other than this

4  litigation, then there wouldn't be harm.  Right?

5          MR. POTEAT:  Well, I do think it would be harm on

6  the third party client who would be brought into this.  But,

7  in terms of the protective order, I understand that they say

8  well that should be enough.  Well, there's plenty of case law

9  out there that we've cited where even when you have a

10  protective order it provides, you know, certain protections

11  for governing all of discovery in a case when there are

12  documents that involve particularly sensitive information that

13  doesn't have relevance that redactions of it are proper.  And

14  I note it's an odd timing as well for Mr. McPike to be

15  claiming that the protective order gives all the protection we

16  need when last night he challenged two of our confidentiality

17  designations.  They're going to file a motion challenging

18  confidentiality designations today by the end of business.

19          And so it seems to me I think I know where this is

20  heading.  And the next motion to follow is going to be a

21  confidential- -- confidentiality designation challenge to this

22  information if it is indeed ordered to be disclosed.

23          Also, I think it's important when considering the

24  protective order the protection it affords.  Mr. McPike has

25  testified in his deposition that he admitted to breaching

1  confidentiality obligations that he owed to us.  And sometimes

2  information designated confidential under a protective order

3  gets disclosed through inadvertence.  And so I'd note, at

4  least what we have been able to gather, when Mr. McPike's

5  counsel filed their motion to seal and attached documents that

6  at the time designated "confidential" by us, they filed it on

7  the public docket.  I'm sure that was by inadvertence, but

8  that information can leek once it's out there.  And so we just

9  don't think, in particular with this sensitive level of

10  information with the confidentiality issues at play that that

11  affords enough protection and that it ought to be -- and that

12  it ought to be permitted to be redacted in the limited

13  narrowly tailored form that we have found.

14         THE COURT:  All right.  Let me give you the final

15  word.

16         MR. PUSCH:  A lot to respond to there.  First of

17  all, it was our understanding that the sealing filed was filed

18  so that the attorneys can see it only.  And if we are

19  incorrect there, then we will safeguard that in the future.

20  But our understanding was that that motion was filed and it

21  was allowed to be seen by attorneys under the Eastern District

22  of Virginia process.  We'll double check that.  But that's our

23  understanding of that.

24         As far as challenging confidentiality, well, we are

25  entitled to challenge confidentiality.  If it's confidential,

1    we're not going to win and it's going to remain confidential.

2    So I don't think that that's really an issue.  I also don't

3    think that we are filing a motion to challenge

4    confidentiality.  We're in discussions with the other side

5    about that.  We're filing a separate motion, I believe, today

6    about their production of 1500 pages of documents in the final

7    week of discovery 50 days afterwards.  But that's for another

8    day.

9            This is not just about also what was in the

10   contract.  This is -- there's a fraud claim.  There is a

11   Virginia consumer protection act claim.  Those claims are

12   about misrepresentations of the goods and services they're

13   offering.  It's not necessarily limited to the contract.  If

14   they promised this circumlunar client something outside of the

15   contract that is similar or identical to what they've promised

16   Mr. McPike or they haven't offered it to Mr. McPike, that

17   would show that you know they realized what they were doing

18   was wrong.  But we're allowed to pressure-test what they have

19   promised and whether it's consistent with the fraudulent

20   behavior that they engaged in with Mr. McPike.  And so it's

21   not just about what's in the contract.  We would love to see

22   the contract to confirm and pressure-test what they -- their

23   own party witnesses have said about it, but it is not just

24   about the contract.

25            I'm not sure I understand what the harms of the

1    third party might be if it's not disclosed outside of the

2    protective order.  The third party is welcome not to answer

3    questions.  We are -- again, we are not allowed to disclose

4    this outside of this litigation.  We will abide by that.  We

5    will stringently attest to that and abide by that protective

6    order.  So I don't think that there is a fear of that either.

7              THE COURT:  -- calling him up and saying I now know

8    what you've done and I want to talk to you --

9              MR. PUSCH:  I don't think we --

10             THE COURT: -- cause some harm.

11             MR. PUSCH:  I don't think we will phrase --

12             THE COURT:  I'm waiting to hear it.

13             (The Court and counsel simultaneously speaking.)

14             MR. PUSCH:  Are you familiar with Mr. McPike?  Are

15   you familiar with Space Adventures?  How are you familiar with

16   him?

17             THE COURT:  Well --

18             MR. PUSCH:  If he's in Virginia though, we can also

19   subpoena him for trial.

20             THE COURT:  And you think that's something that you

21   would be looking forward to?

22             MR. PUSCH:  No, I suppose --

23             THE COURT:  I --

24             MR. PUSCH: -- testimony, but --

25             THE COURT:  I --

1          (The Court and counsel simultaneously speaking.)

2          MR. PUSCH:  But, if he has relevant information,

3   then Mr. McPike is entitled to that.

4          THE COURT:  And again, let's go back to how relevant

5   is information about their negotiations with a client

6   following their negotiations with Mr. McPike.

7          So Mr. McPike entered into an agreement in 2013, is

8   that right?

9          MR. PUSCH:  That's right, 2013, yes.

10          THE COURT:  2013.  And so there were negotiations

11   back and forth as to what was going to be done and who had

12   certain obligations and certain representations.  And he made

13   his $7 million deposit.  As time went on in 2014 things

14   changed and there were discussions about trying to modify the

15   agreement that he had.  Didn't get worked out.  March of 2015

16   Space Adventures cancels the contract, right?

17          MR. PUSCH:  Yes.

18          THE COURT:  Okay.  So I'm still -- we're getting

19   back down to, you know, where is it that the negotiations with

20   someone who comes in after the fact, that is everything that

21   happened to Mr. McPike, it happened.  All of the

22   representations that have been made, all the statements done,

23   all the signing, money paid, termination done, how what they

24   did with somebody, six months, year, however long later,

25   really is relevant to Mr. McPike's claim in this case?

1          MR. PUSCH:  Yeah, and I think that the -- as I've

2   explained, it exhibits a pattern of behavior.

3          THE COURT:  So you're saying one additional action

4   could be a pattern?

5          MR. PUSCH:  I think that -- well to the extent I

6   also mentioned that they have not -- they told us that it's

7   current and prospective clients.

8          THE COURT:  Right.  They have a customer list.

9          MR. PUSCH:  So that could be more than one.  That

10  could be a persistent and repeated behavior.  But even more

11  than one, this really comes down to what the Supreme Court

12  decided in the *BMW* case and the Eastern District of Virginia

13  in the *Ebersole* case.  In the *Ebersole* case, it was noted that

14  a significant factor in the assessment and in position of

15  cumulative damages was evidence that defendant had ever

16  engaged in similar conduct with respect to any other person is

17  a highly persuasive factor to the assessment of punitive

18  damages.  And so that's -- that -- Mr. McPike punitive damages

19  claim, that's a highly persuasive factor as to what --

20         THE COURT:  Consistent course of conduct, I mean is

21  what -- what you would need to, in most instances, to boost

22  your claim for punitive damages.  Mr. McPike has a stand alone

23  independent claim for punitive damages.

24         MR. PUSCH:  Yes.

25         THE COURT:  And anybody else whose gotten hurt.  If

1   he says it was willful and can show willfulness and other

2   instances of bad conduct, he would be entitled to a punitive

3   damages claim without any other -- so you're talking about how

4   punitive.  And part of that is, you know, persistent course of

5   conduct and financial wherewithal or what is it that has to be

6   done to punish the person.

7               MR. PUSCH:  Yes.

8               THE COURT:  So help me understand how a one -- one

9   client discussion in contract can be turned into a persistent

10  course of conduct.

11              MR. PUSCH:  Well, I will respond in two ways to

12  that.  One is that, as the defendants have a knowledge, this

13  is not a high volume business.  This is we get a client and

14  that client is going to pay $150,000,000 for a product.  We

15  may get two clients on that.  It's a very low-volume,

16  high-cost business.  And so the persistent behavior relative

17  to this type of business would be a small client base.

18              Secondly, the defendants are still representing and

19  lying -- are misrepresenting on their website that there's a

20  circumlunar trip and it's going to happen before the end of

21  the decade.  They admitted in testimony that that ain't true.

22  And that's why it's more than just what this -- this new

23  client would give weight to that misrepresentation that still

24  exist on their website about this trip.  And that's why it's

25  critical.  But it also is circumstantial evidence to the

1  general fraud and Virginia Consumer Protection Act claims in

2  that it shows -- the persistent behavior shows that it's more

3  likely that they were misrepresenting these things to Mr.

4  McPike as well.  The punitive damages claim is really the crux

5  of how this is so highly persuasive and relevant in this case.

6  THE COURT:  Well, this has -- this case has come up

7  with some very interesting issues over its lifetime in our

8  court so far and I suspect we'll probably still have some

9  before it gets resolved.

10  And there are a couple of components to this.  The

11  first is, I -- the argument about whether you can redact or

12  not redact.  And I think, you know, it is not inappropriate

13  for redactions to be done to documents when there is both a

14  relevancy and a confidentiality concern.  I agree that if it

15  was just relevancy it might be some difficulty in establishing

16  that it is the party whose done the redactions obligations to

17  establish while those redactions were done and that they were

18  appropriate.  And I sincerely appreciate the party's working

19  together to get this down to the one narrow issue.  To the

20  narrow issue that it has become.  And that is, you know, the

21  actual identity of the client and prospective customers.

22  So first, you know, I'm not making a wholesale

23  ruling that redactions of this nature are inappropriate.  That

24  they can be done if there's both the relevancy argument and

25  the highly confidential concerns that have been expressed in

1   the opposition or in the defendant's position.  I am not

2   convinced that the identity of this client is relevant to be

3   honest with you.  I -- I've gone back and forth in trying to

4   figure out how that could come into play in the trial of this

5   case.

6          And, you know, I understand there is a claim for

7   punitive damages, but I really -- I don't see how exploring

8   one additional client's contract, beliefs, statements,

9   understandings, particularly given the sensitive nature of --

10  and I think the defendant did a good job in explaining how

11  sensitive it is to the client that that information that he

12  has agreed or has signed onto an agreement to do this not be

13  disclosed outside of people who have agreed to keep it

14  confidential under the terms of a written agreement like that.

15  It really is of a pretty sensitive nature to him to do that.

16         I just -- I don't see how that information is

17  sufficient enough to overcome those concerns in this case.  So

18  I'm going to -- the secondary reason is, you know, this

19  really -- if these documents were produced, there really is --

20  the timeliness of this motion comes into play.  Discovery ends

21  today.  There wouldn't be any ability to do any discovery as

22  to this person to find out any information that he may have

23  conversations that he may have had understandings, beliefs,

24  those kinds of things.  The idea that we could possibly

25  subpoena that person to show up at trial, I think, is not a

1   very strong argument.

2          We have no idea whether he's in Virginia.  I suspect

3   even if he was to agree to voluntarily discuss the issues with

4   the parties, you know -- I don't see that being something that

5   is very likely under the circumstances.

6          So for those reasons I'm going to deny the motion to

7   compel and see how things work out from here on out.

8          MR. PUSCH:  Your Honor, if I may follow up on one

9   other point.  Just with regards to discovery.  The parties

10  have agreed to -- the plaintiff has allowed the defendant to

11  take untimely depositions next week and the week after.  So

12  I -- to the extent that it might change your opinion, I would

13  say that we are going into discovery beyond the discovery

14  deadline by agreement of the party's.

15         THE COURT:  Can't do it.  Can't do it.  You know if

16  something happens, that has not been agreed to by the Court.

17  And the rules are clear.  Continuances aren't done by the

18  parties, only by the Court.  So that is at everyone's peril.

19         MR. PUSCH:  The deposition is after the fact --

20         THE COURT:  Any discovery after the discovery cutoff

21  date without the Court approval of that.  And so, you know, if

22  for some reason you want to try and get some cover on that,

23  you can put together a consent order asking that these

24  depositions be taken after the discovery cutoff date so that

25  you can be comfortable that, you know, you'll be able to do

1    what you've now agreed to do.

2         I don't know where anybody would have thought that

3    the idea of we can agree to extend the discovery cutoff date

4    would fly in this court.

5         MR. PUSCH:  Understood.  To be clear, we are not

6    taking any of these depositions.

7         I guess the other question that I have is, would it

8    be -- would Your Honor be open to at least a confirmation that

9    the -- this lunar client is outside of the subpoena power of

10   the Court for trial?  If we could have a designee -- just a

11   confirmation from the -- if that would sway the Court's

12   decision.  Just an idea.

13        THE COURT:  Well, I -- I'm not sure what you're

14   asking for.

15        MR. PUSCH:  If the defendants would submit something

16   confirming that the individuals not outside -- it is outside

17   the subpoena power, or if the individual is within the

18   subpoena power if that would sway the Court's opinion on this

19   order one way or the other.  I suspect he is not anyway.

20        THE COURT:  Yeah, I'm not -- not to ensure that's

21   giving more information than for question that some

22   information be provided in a language other than English for

23   him to understand.  I mean I'm -- but --

24        MR. PUSCH:  Fair enough.

25        THE COURT:  What's the defendant's position on

1    indicating whether the person resides within the subpoena

2    power of this court?

3           MR. POTEAT:  I don't think that's proper or

4    necessary.  Of course we can do that, but --

5           THE COURT:  Well, honestly, I'm not sure that would

6    necessarily sway my ruling.  I mean my ruling is whether,

7    relevant or not -- under the circumstances I'm really not

8    comfortable that his information would be as significant as

9    the plaintiff indicates it may be under the circumstances.

10          Okay.  What's going on on discovery now?  And I'm

11   kind of shocked that Williams & Connolly would think that they

12   could agree to do discovery outside of the discovery period

13   without the Court's approval.

14          MR. POTEAT:  The issue that arose was with the

15   ruling on February 9th with opening -- with opening up

16   subsequent documents for production.  We attempted to schedule

17   them all before the end of the discovery cutoff because of the

18   scheduling issues on the other side, we were not able to do

19   that.  And so while understanding that there's no cover from

20   the Court with what happens with that, we thought that was

21   better than nothing in keeping the case on track.

22          We also agreed and I don't know -- the other side is

23   taking a deposition of our expert tomorrow.  And so it was

24   a -- it was a time crunch that we were trying to deal with

25   while keeping the summary judgments schedule on track, Your

1   Honor.

2          THE COURT:  What are the current dates that you have

3   with -- with Judge Ellis?

4          MR. POTEAT:  March 13th is the date for motions,

5   summary judgment, Daubert, all the other motions.  And then I

6   think two weeks after that are the oppositions and replies.

7   And the motions hearing is on April 6th.

8          THE COURT:  So is the final pretrial conference

9   still set for March?

10         MR. POTEAT:  April 27th.

11         THE COURT:  Okay.

12         MR. POTEAT:  I think it's April 27th off the top of

13  my head.

14         THE COURT:  And what is your -- so the depositions

15  that you've agreed to do don't alter any of those other dates,

16  is that right?

17         MR. POTEAT:  That's correct, Your Honor.

18         THE COURT:  Well, what I would suggest that, if you

19  want to, is just put together a short order, consent order

20  that the party's have agreed to take the following depositions

21  at dates and times that you've agreed to do and indicate in

22  there that it has -- will not alter any of the other dates

23  that have been set by the district judge for briefing with a

24  final pretrial conference.  I'll sign it and we can all sleep

25  a little bit better knowing that that's -- follow the right

1  procedure, okay.

2       MR. POTEAT:  Thank you, Your Honor.  I just had one

3  other issue given that today is the official close of

4  discovery and given that Mr. Mawdsley, who is the issue in the

5  earlier motion and is actually being deposed today at Williams

6  & Connolly across the river.  But a dispute arose in

7  connection with a communication with Mr. Mawdsley

8  communicating to certain witnesses in this case shortly before

9  their depositions, and we've been trying to get an

10  understanding of the nature of that communication.  It hasn't

11  been crystal clear what it was.  But last night it was

12  produced, yesterday evening, and it was Mr. Mawdsley

13  communicating with three of the witnesses, fact witnesses for

14  Mr. McPike, that we deposed in this case sending them

15  documents.

16       One appears to be the amended complaint.  They

17  produced the cover e-mail, but not the documents that were

18  transmitted with that.  But there appear to be 250 other pages

19  of documents that were transmitted as well to these witnesses.

20  And so you have a nonlawyer transmitting materials from this

21  case right before depositions of these three witnesses.  We've

22  asked that they produce those documents and they have not

23  agreed to do so.  And so we did want to raise that issue.

24  We're happy to go through the process of briefing it, but

25  because Mr. Mawdsley resides in New Zealand and we would

1  prefer not to have to bring him back at any point to answer

2  questions about his communications with witnesses prior to

3  their depositions, we thought it prudent to raise now in the

4  matter of efficiency.

5        THE COURT: You know I'm willing to hear what you

6  want to say. I'm not sure I'm willing to resolve it.

7        What is the situation?

8        MR. PUSCH: So, Your Honor, what this -- what

9  happened here is that one witness testified that he was sent a

10 document that he browsed through that he explicitly testified

11 did not refresh his recollection. He couldn't describe it.

12 He didn't learn anything from it. He doesn't really remember

13 anything about it. That kind of spurred this interest in like

14 oh, what's this document. We've been working with the other

15 side, because first of all, it was a document that originated

16 with counsel. Counsel put together some documents for Mr.

17 McPike to review. I'm unclear that he actually did. And then

18 that was sent by Mr. Mawdsley to other witnesses.

19       Now they've asked all of these individuals, and I

20 suspect they're asking Mr. Mawdsley as we speak: What have

21 you communicated with? What have you sent people? They're

22 welcome to ask those questions. But all these other witnesses

23 have testified, have not testified that they looked at any of

24 these documents. They didn't refresh their recollection.

25 They have no basis for seeking it. It's work product. It's

1   not right.  There's no motion filed for it.  We've maintained

2   work product over the content of that information because it

3   was put together by attorneys, selected documents, and that

4   work product privilege remains because it hasn't been

5   disclosed to an adverse party.

6          And so, first of all, I don't think it's ripe for

7   discussion right now.  And, you know, we've worked closely

8   with them to lay their -- just to kind of confirm like look,

9   the 50-page document he referenced that he doesn't recollect,

10  this e-mail will give you confirmation of what it is.  But

11  that's it.  So I don't know --

12         THE COURT:  Well, you know, I -- the one-week motion

13  gives people an opportunity to put things in front of the

14  Court fairly quickly.  It gives the Court an opportunity to

15  look at it and consider it and not try to make a decision

16  based on, you know, back and forth in oral discussions.

17  Honestly, I -- I like to read stuff, make sure I understand

18  what the work product issue would be involved, if there is a

19  work product issue involved.  If it was a simple one that if

20  he's going to be deposed here or there, I can usually deal

21  with those in an off-the-cuff oral basis.  But if we're

22  getting too deep, I want to be able to look at it and make a

23  considered decision as opposed to sort of a seat-of-the-pants

24  decision on that.

25         So I appreciate the heads up.  Hopefully you all can

33

1    work it out, but if you can't, then I'll consider it in due

2    course.

3             MR. PUSCH:  And, Your Honor, with regards to other

4    depositions, I think there may be, assuming the parties can't

5    come to an agreement today, there may be a motion for

6    reopening deposition for documents produced.  But we will be

7    filing --

8             THE COURT:  And I -- you know, I encourage counsel

9    to work together, but I want you to be protected in case

10   something happens.  And, you know, I don't want to be in the

11   position of somebody coming in two weeks from now and saying I

12   was doing a deposition last week and so-and-so happened and

13   you know it -- the argument is that deposition wasn't really

14   sanctioned by the Court and I'd be in a position to say,

15   "Sorry, I can't do anything about it.  You were doing

16   something off the books, so to speak."

17            So protect yourself and it will help protect me as

18   well.

19            Okay.  Thank you.  Court will be adjourned.

20

21            (Proceedings adjourned at 11:10 a.m.)

22

23

24

25

1                     <u>CERTIFICATE OF REPORTER</u>

2

3         I, Tonia Harris, an Official Court Reporter for

4 the Eastern District of Virginia, do hereby certify that I

5 reported by machine shorthand, in my official capacity, the

6 proceedings had and testimony adduced upon the Motion

7 Hearing in the case of the **HARALD McPIKE versus**

8 **ZERO-GRAVITY, et al**, Civil Action Number 1:17-CV-562, in

9 said court on the 23rd day of February, 2018.

10         I further certify that the foregoing 34 pages

11 constitute the official transcript of said proceedings, as

12 taken from my machine shorthand notes, my computer realtime

13 display, together with the backup tape recording of said

14 proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16 name, this the March 8, 2018.

17

18

19

20

21                                 _____

22                         Tonia M. Harris, RPR
                          Official Court Reporter

23

24

25