IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| HARALD MCPIKE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Case No. 1:17-cv-562 |
| | ) | |
| ZERO-GRAVITY HOLDINGS, INC. | ) | |
| f/k/a SPACE ADVENTURES, LTD., *et* | ) | |
| *al.*, | ) | |
|     Defendants. | | |

## ORDER

In 2012, plaintiff, an Austrian billionaire, decided he wanted to circumnavigate the moon and was willing to pay $150 million to do it. To achieve his goal, plaintiff contacted defendant Space Adventures, Ltd. ("SA"), a Virginia space tourism company, to purchase a seat on SA's first circumlunar mission. The parties entered into their Circumlunar Space Flight Purchase Agreement ("Agreement") on March 20, 2013, and plaintiff paid the initial deposit of $7 million. But regrettably, the parties fell to fighting and plaintiff never made it around the moon. Instead, after paying the initial $7 million deposit, plaintiff elected not to make further payments and ultimately demanded the return of his deposit. For its part, SA refused to return plaintiff's $7 million deposit, arguing that plaintiff breached the Agreement by failing to make the next required contractual installment payment. Essentially, SA asserts that plaintiff got "cold feet" and is not entitled to the return of his deposit. Plaintiff responds to SA's argument, asserting that SA breached the Agreement on the date it was signed because SA did not have the right to offer a seat on the circumlunar

mission as warranted in the Agreement. This case was brought to resolve the parties' dispute and decide the fate of plaintiff's $7 million deposit.

Whether plaintiff is entitled to reimbursement of his $7 million deposit or SA is entitled to retain plaintiff's deposit is the subject of the parties' cross-motions for summary judgment, both of which are ripe and ready for disposition. The dispositive question in this case is whether SA breached the express warranty in the Agreement stating that SA owned the right to provide a circumlunar mission. Because there are disputed material facts that would permit a jury to determine whether SA owned the right to provide a circumlunar mission, summary judgment is inappropriate, and this matter must be set for a jury trial.

## I.

The parties have felled forests (and not incidentally spent a small fortune) in their fight over plaintiff's $7 million deposit. Though hotly litigated, this is a relatively straightforward breach of warranty case and the parties' motions can be resolved by looking at the four corners of the parties' Agreement and the record to determine whether there is any evidence that SA owned the right to provide the circumlunar mission as warranted. These material facts, which are undisputed by the parties, provide relevant background information: [1]

- Plaintiff, eager to experience spaceflight, contacted SA in 2012 to express interest in a circumlunar mission it was advertising.

---

[1] In its statement of undisputed material facts, SA states that plaintiff is a "casino-banned card counter." This assertion is entirely irrelevant to the parties' dispute and the inclusion of this irrelevant and inflammatory fact in SA's brief by defense counsel is unwarranted.

- An employee of SA contacted plaintiff and informed him that the cost of a circumlunar mission was approximately $150 million.

- SA also informed plaintiff that he would have to enter into a Mutual Non-Disclosure Agreement before discussions and negotiations could continue.

- Plaintiff signed the Non-Disclosure Agreement, submitted a medical questionnaire and engaged in multiple conversations with SA's President Thomas Shelley ("Shelley") and SA's Chairman and CEO Eric Anderson ("Anderson").

- On November 13, 2012, Shelley emailed a draft of the Circumlunar Space Flight Purchase Agreement (the "Agreement") to plaintiff. The draft contained an ownership recital which stated, in effect, that SA owned rights to provide the circumlunar space flight. Pl.'s Mot. Sum. J. at ¶ 4.

- Plaintiff requested that this recital be incorporated into the Agreement as a warranty. *Id.* at ¶ 5.

- After engaging in several months of discussions and negotiations, SA signed the Agreement on March 19, 2013, and plaintiff signed on March 20, 2013. *Id.* at ¶ 8.

- The ratified Agreement contains the following relevant contractual provisions:

  o Articles 1 and 3 of the Agreement represent that SA has proprietary rights to provide a circumlunar flight via Roscosmos' Soyuz-TMA spacecraft. *See* Circumlunar Space Flight Purchase Agreement, March 20, 2013, (Doc. 25).

    ▪ Specifically, Article 1 of the Agreement states that SA "*owns the rights to provide a circumlunar space flight*, after having obtained such rights from Rocket and Space Corporation Energia ('RSCE'), the official operator of the Soyuz-TMA spacecraft and from the Russian Federal Space Agency ('RFSA'), the official entity designated by the sovereign government of the Russian Federation." *Id.* (emphasis added).

    ▪ Likewise, in Article 3, Section 3.09 of the Agreement, SA further "represent[ed] and warrant[ed] that it . . . *owns the*

3

*rights to provide a circumlunar space flight." Id.* (emphasis added).

- o Article 5, Section 5.02 of the Agreement sets forth a detailed payment schedule that obligated McPike to pay varying amounts of money at certain contractual stages. *Id.*

- o Article 5, Section 5.03 explicitly states that "payments toward the Space Flight Experience Price listed above shall not be refundable to the Client, except as expressly provided in Article 7 of this Agreement." *Id.*

- o Article 6 of the Agreement contains several provisions, all of which relate to confidentiality, non-disclosure and non-competition. *Id.*

- o Article 7, Section 7.02.01 provides that SA can terminate the Agreement for non-payment and retain all previously received payments at liquidated damages. *Id.*

- o Article 7, Section 7.03.01 states that McPike could terminate the agreement, but would forfeit the $7,000,000 deposit. *Id.*

- o Article 7.03.02 provides that even if the circumlunar mission has not been initiated by 2020, McPike's $7,000,000 deposit would be retained, but all other monies would be returned. *Id.*

- o And finally, Article 8, the Agreement's choice-of-law and choice-of-forum provision, provides that Virginia law governs this case and that any dispute must be tried in a state or federal court in the Commonwealth of Virginia. *Id.*

- On March 27, 2013, plaintiff paid the initial deposit of seven (7) million dollars as set forth in the Agreement. Pl.'s Mot. Sum. J. at ¶ 10.

- Plaintiff made no further payments after March 27, 2013.

- By notice dated March 24, 2015, SA terminated the Agreement. *Id.* at ¶ 5.

- SA retained plaintiff's $7 deposit payment. *Id.* at ¶ 13.

The primary material issue disputed by the parties is whether SA, through its

agreements with Roscosmos, actually "own[ed] the rights to provide a circumlunar space

4

flight." SA asserts that the deposition testimony of Shelly and Anderson creates a material dispute, because these individuals testified that SA owned the rights to provide the space mission as warranted to plaintiff in Article 1 of the Agreement.  Plaintiff, by contrast, argues that SA's corporate representative admitted in her Rule 30(B)(6) deposition that she was unaware of any contract between SA and Roscosmos in which SA acquired ownership rights in one of Roscosmos' circumlunar missions.  Plaintiff asserts that SA should be bound by the testimony of its corporate representative, and that the testimony of Anderson and Shelly should be excluded because it contradicts SA's Rule 30(B)(6) testimony.  Pl's Mot. in Limine (Doc. 170).  Plaintiff further asserts that if Anderson and Shelly's testimony is excluded, summary judgment should be granted in his favor because the record is devoid of evidence that SA owned the rights to provide a circumlunar flight and therefore the Court can determine as a matter of law that the express warranty was violated at the time the Agreement was signed.[2]

## II.

The standard for summary judgment is too well-settled to require extensive elaboration here.  Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine factual dispute exists if "there is sufficient evidence on which a reasonable jury could return

---

[2] Plaintiff is correct that, standing alone, the written agreements and memoranda of understanding between SA and Roscosmos do not demonstrate that SA owned the right to provide the circumlunar mission as warranted.

a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## III.

The first issue raised by the parties' cross motions – what the elements of a breach of warranty are – is a pure question of law. Plaintiff asserts that in Virginia a breach of warranty claim consists of only two elements: (i) a warranty, and (ii) a breach of that warranty. SA contends that warranty claims have a third element, namely causation, and that plaintiff's breach of warranty claim fails because he cannot prove that SA's breach caused his damage. In other words, SA believes that plaintiff terminated the contract not because he knew about the failure of any warranty, but because he got cold feet about paying over one hundred million dollars to go to space.

Warranties have been described as "a curious hybrid born of the illicit intercourse of tort and contract, unique in the law." William L. Prosser, *Handbook of the Law of Torts* § 95, at 651 (3d ed. 1964). For this reason, various jurisdictions differ in defining the elements of an express warranty claim.[3] Judge Learned Hand, however, provided a succinct definition of a contractual warranty that is instructive here:

---

[3] Virginia law appears not to require a plaintiff to prove causation to prove a breach of express warranty claim. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). Several other state courts appear to take Virginia's approach to express warranties. *See, e.g., Neilsen v. Am. Honda Motor Co.*, 92 Haw. 180, 190–91, 989 P.2d 264, 274–75 (Haw. Ct. App. 1999) ("In a breach of express warranty claim, plaintiff must prove that (1) defendants made an affirmation of fact or promise regarding the product, (2) that statement became part of the basis of

> A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946). With this general principle in mind, it is now appropriate to look to established precedent to determine the elements of an express warranty claim under Virginia law.

Careful review of the law demonstrates that plaintiff's legal position is supported by binding Fourth Circuit precedent and settled Supreme Court of Virginia precedent, and SA's position is not. Although no Virginia case, state or federal, has explicitly stated that a breach of warranty claim has no causation requirement, courts in this Commonwealth have consistently stated that a breach of warranty claim has only two elements – (i) existence of warranty, and (ii) breach of that warranty. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (holding that a breach of express warranty claim in Virginia is proven by establishing two elements: (1) the existence of a warranty,

---

the bargain, and (3) the product failed to perform according to the statement."); *Carolina Freight Corp. v. Ratner Enterprises, Inc.*, No. 86 C 4822, 1987 WL 11348, at *3 (N.D. Ill. May 18, 1987) ("To succeed on a breach of warranty claim, a plaintiff must prove that 1) the defendant made a definite and positive assertion of a material fact for the purpose of inducing the plaintiff to rely on it; 2) the alleged warranty was such that a reasonably prudent person would rely on it; and 3) plaintiff did rely upon the alleged warranty." (citing *Michuda v. Sanitary Dist. of Chicago*, 305 Ill. App. 314 (1st Dist. 1940)). Other state courts have disagreed, explicitly holding that breach of warranty claims include a causation element. *See, e.g., Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind.Ct.App. 2009); *Palmer v. A.H. Robbins Co.*, 684 P.2d 187 (Colo. 1984); *Am. Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 595 (Ok. 1983).

and (2) a breach (citing Collier v. Rice, 233 Va. 522 (Va. 1987)). The *Hitachi* Court, and the underlying state supreme court decisions on which it relies, are notably silent as to any causation requirement.

Based on the Fourth Circuit's decision in *Hitachi*, which is binding here, and decisions of the Supreme Court of Virginia,[4] which are also binding on this question of Virginia law, plaintiff need not prove causation to state a claim for breach of warranty under Virginia law.[5] Therefore, SA's summary judgment motion, which is based largely on its contention that plaintiff failed to prove that his damages were proximately caused by SA's breach, fails because, as stated above, Virginia law does not require proof of causation to state a breach of warranty claim. Accordingly, SA's motion for summary judgment must be denied.

---

[4] *See Hubbard v. Dresser, Inc.*, 271 Va. 117, 123, 624 S.E.2d 1, 4 (2006) (holding that the allegations in plaintiff's complaint were sufficient to state a breach of express warranty claim because (i) defendant "expressly warranted" that the diesel fuel dispensing equipment it supplied to plaintiff would be "free of defects in design, workmanship and material," and (ii) defendant allegedly breached this express warranty because the fuel pump malfunctioned "within days and never operated properly."); *Daughtrey v. Ashe*, 243 Va. 73, 76, 413 S.E.2d 336, 337 (1992) (holding that plaintiffs stated breach of express warranty claim when defendant represented that the diamond was a particular quality and the diamond was of lower quality. Plaintiffs were permitted "to recover for their loss of bargain.").

[5] Admittedly, the *Daughtrey* Court was construing Virginia Code § 8.2–313, which only applies to goods and not services. However, the principles governing statutory and common law warranties are essentially the same: the purpose of a warranty is to guarantee a party that goods or services will adhere to specific quality or performance standards.

## IV.

To be sure, this Court cannot weigh evidence at the summary judgment stage; weighing evidence is the sole province of the jury. Instead, summary judgment can only be granted at this stage if SA cannot prevail as a matter of law.

Plaintiff is correct that there is substantial record evidence that appears to show that SA did not own the right to provide a circumlunar mission as warranted. Specifically, SA's own corporate representative, through her Rule 30(B)(6) testimony, disclaimed any knowledge of a formal agreement between SA and Roscosmos to conduct a circumlunar mission. Additionally, the agreements and memoranda of understanding between SA and Roscosmos also demonstrate that there was no formal, written contract between the two entities granting SA the right to provide a seat on a circumlunar mission. But as SA points out, Anderson and Shelly, SA's former executives, testified that SA obtained and owned the right to provide a circumlunar mission from Roscosmos as warranted in the parties' Agreement through a series of written and oral agreements.[6] SA asserts that its course of

---

[6] For example, in his deposition testimony, Anderson testified as follows:

> Sir, there are a number of documents that form the basis along with a long history of progress and correspondence and reliance and work to bring the circumlunar mission into reality. It's not just one document. But it all started with this memorandum of understanding, Plaintiff's Exhibit Number 5.
>
> . . . .
>
> Sir, I have a -- I have a general understanding of these agreements. I am -- am not a lawyer, and yet I am a business person. And I didn't need to do anything in particular to satisfy myself that this clause or this statement was true because it is true. And the -- the agreements going back to the 2005 contract, the Orbital Technologies agreements, the agreements -- there were several agreements

dealing with Roscosmos, viewed in its entirety, demonstrates that it owned the right to provide the space mission as warranted.

Plaintiff makes much ado about SA's Rule 30(B)(6) deposition, asserting that because SA's corporate representative disclaimed any knowledge of a formal agreement granting SA the right to provide a circumlunar mission, SA should be precluded from relying on the contradictory testimony of Anderson and Shelley. Plaintiff misses the point. Although the corporation may be precluded from changing or supplementing its Rule 30(B)(6) position by formally adopting the testimony of others, this does not prevent SA from putting on the testimony of Anderson and Shelly at trial, even if their testimony undercuts the corporate representative's testimony. In other words, the 30(B)(6) witness's testimony that she was not aware of any agreement between SA and Roscosmos does not preclude Anderson and Shelly, who may be more informed about SA's business dealings, from testifying that such an agreement did exist.

Anderson and Shelly may testify at trial to their belief that SA, through its agreements and business dealings with Roscosmos, owned the rights to a seat on a circumlunar mission. Although this testimony will be ripe for cross-examination, SA may still present it to a jury. In other words, defendant could present a series of agreements and memoranda of understanding along with the testimony of Shelley and Anderson and

---

directly with Roscosmos for the purchase of private Soyuz missions during this time. Those agreements exist as a basis for and as a demonstration of the long history of -- of service that we provide under this contract, and -- they do.

Dep. Eric Anderson, Feb. 9, 2018 at 120, 179-80.

potentially convince a jury that through a series of written and oral agreements, defendant did own what it warranted to own, namely the right to provide a circumlunar space flight. Although this evidence, at first glance, appears flimsy, it is enough to defeat plaintiff's motion for summary judgment. Of course, after all the evidence is heard the parties may submit Rule 50 motions and this matter may still be decided as a matter of law depending on the nature of the evidence adduced at trial.

Although it is a close call, plaintiff's motion for summary judgment must be denied for the reasons set forth above. This result must be reached because there is at least some record evidence, namely the deposition testimony of Anderson and Shelly, that could permit a reasonable jury to find in SA's favor.

## V.

For the reasons set forth above,

It is hereby **ORDERED** that plaintiff's motion for summary judgment (Doc. 154) is **DENIED**.

It is further **ORDERED** that SA's motion for summary judgment (Doc. 189) is **DENIED**.

It is further **ORDERED** that the parties must attend a settlement conference with the Judge Theresa Carrol Buchanan on **March 28, 2019 at 1:30 p.m.**, unless they settle the matter through private efforts before then.[7]

---

[7] This matter cries out for a sensible commercial resolution based on a well-reasoned assessment of the strengths and weaknesses of each side's case. Counsel and the parties are strongly encouraged to attempt to reach a reasonable resolution of this case as it is always true that an

If this case does not settle on March 28th (or before) the following deadlines will apply:

It is further **ORDERED** that oral argument is scheduled for all remaining motions, including the parties' motions *in limine* and SA's objections to the Magistrate Judge's ruling on privileged documents, for **March 29, 2019 at 10:00 a.m.** These matters will likely be decided from the bench following oral argument, and no additional briefing is necessary.

It is further **ORDERED** that this matter is set for a jury trial on **Tuesday, April 9, 2019 at 10:00 a.m.**

Given the Court's busy calendar, the settlement conference, the motions *in limine* hearing and the jury trial cannot be rescheduled. Counsel will have to make themselves available at these times or draft replacements from the legions of lawyers who work at their respective law firms.

The Clerk is directed to provide a copy of this Order to all counsel of record.

Alexandria, Virginia
March 14, 2019

/s/

T. S. Ellis, III
United States District Judge

---

agreed resolution that ends litigation is preferable to the continued expense and uncertainty of hand-to-hand combat.

/s/
T. S. Ellis, III
United States District Judge